## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Keith Brown, being duly sworn, state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") assigned to the

Boston, Massachusetts Field Office.  Since joining the FBI in 2014, I have been assigned to

squads that investigate economic crimes, including various forms of corporate and securities

fraud.  During my training at the FBI Academy, Quantico, Virginia, I received training in a

variety of investigative and legal matters, including Fourth Amendment searches, the drafting of

search warrant affidavits, and probable cause.

2.      Pursuant to this affidavit and criminal complaint, I seek to charge Roger KNOX, also

known as "Rocket" Knox, with conspiracy to commit securities fraud, in violation of Title 18,

United States Code, Section 371, and securities fraud, in violation of Title 15, United States

Code, Sections 78j(b) and 78ff.  Because this affidavit is being submitted for the limited purpose

of demonstrating that there is probable cause to arrest KNOX on the federal criminal charges set

forth above, I have not included each and every fact known to me and to other law enforcement

officers involved in this investigation.  Rather, I have included only those facts that I believe are

necessary to establish probable cause for the issuance of the requested warrant.

### RELEVANT REGULATORY PRINCIPLES AND DEFINITIONS

3.      Federal securities laws and regulations mandate certain disclosures by holders of large

quantities of public company stock, and further limit the ability of such shareholders to sell their

stock in the open market.  For example, when a person or group of persons acquires beneficial

ownership[1] of more than 5 percent of a voting class of a company's equity securities registered under Section 12 of the Securities Exchange Act of 1934, the person(s) is required to file a Schedule 13D with the Securities and Exchange Commission ("SEC") disclosing such ownership. This schedule is publicly available, and is provided both to the issuing company (the "issuer") and the exchange on which the issuer's securities are traded.

4.        Similarly, restricted securities and control securities are subject to Rule 144 of the Rules and Regulations promulgated by the SEC ("Rule 144"). Restricted securities are shares acquired directly from an issuer that are not registered with the SEC, and that generally cannot be sold to the public. By contrast, shares that *are* registered with the SEC, and that do *not* bear a legend indicating they are restricted, are considered "free-trading," and may be bought and sold in the public market. Control securities, in turn, are securities owned by so-called "affiliates" of the issuer, which are persons or entities who directly, or indirectly through one or more intermediaries, control, or are controlled by, or are under common control with, the issuer. Persons holding more than 10% of an issuer's stock are generally deemed to be affiliates, who are subject to significant restrictions in the quantity of an issuer's stock that the affiliate can legally sell. In the context of over-the-counter ("OTC") securities—which are generally not traded on major exchanges—holders of restricted or control shares are not permitted to sell more than one percent of the issuer's total outstanding shares in any three-month-period.

5.        I know from my training and experience that in the securities fraud context, individuals or groups of co-conspirators will frequently acquire a large portion of an issuer's free-trading shares and then distribute those shares among accounts held in the name of "nominees"—

---

[1] A beneficial owner is any person who directly or indirectly shares voting power or investment power (the power to sell a security).

including sham entities and other third parties—to help conceal their identities as the true owners of the stock and thereby avoid reporting requirements and restrictions such as those contained in Rule 144, and as imposed by brokerages selling the stock.

6.      This type of scheme occurs frequently in the "microcap" or "penny" stock market. Microcap or "penny" stocks are publicly traded U.S. companies—generally traded on the OTC markets—that have a low market capitalization and a low price per share (frequently, though not always, $1 or less). Microcap stocks are often subject to price manipulation because they tend to be thinly traded and subject to fewer reporting requirements than larger companies whose shares trade on major exchanges. Additionally, large blocks of microcap stock may be controlled by a small number of individuals, which can make it easier for those individuals to orchestrate manipulative trading in those stocks.

7.      One such manipulative scheme is a "pump-and-dump," which typically involves an effort to artificially inflate the price or trading volume of a stock (the "pump") so that individuals who control a substantial position can sell their shares at artificially high prices, or in a more liquid market, to other investors (the "dump"). Typically, pump-and-dump schemes involve the use of news releases and other forms of promotion, often containing false or exaggerated information, to inflate the stock price and trading volume and generate demand for the shares. Such schemes may also involve manipulative trading techniques such as wash and match trades—which are, generally, purchases and sales of securities that match each other in price, volume and time of execution, and involve no change in beneficial ownership—and which are also intended to promote the false appearance of interest and activity in the stock.

## OVERVIEW OF THE SECURITIES FRAUD SCHEME

8.      From approximately June 2015 to the present, KNOX, together with a co-conspirator, has

3

operated an asset manager in Switzerland called, alternately, Silverton, SA or Wintercap, SA (hereinafter referred to collectively as "Silverton") that, at his direction—and in coordination with co-conspirators in the United States, Canada and elsewhere—appears to be singularly focused on the manipulation of microcap securities. The evidence I have reviewed shows that, in furtherance of this scheme, KNOX allows nominee shareholders, operating at the direction of a single control group, to transfer their shares to trading accounts in Silverton's name at other brokerages in the United States, Malta, Dubai, Mauritius, Canada, and the United Kingdom. KNOX then directs the trading of those shares as part of the pumping-and-dumping of those securities, collecting a fee of approximately 6 percent of the proceeds for his services. After the shares have been sold, KNOX funnels the proceeds, less his commission, back to the control group through a complex money transfer system that disguises the source and nature of the funds.

9.      Investigators have, to date, identified over 100 stocks sold through Silverton as part of this scheme, generating estimated proceeds of approximately $164 million between June 2015 and the present.

### COOPERATING WITNESSES

10.     A cooperating witness ("CW-1") has advised the FBI that he, together with other individuals, fraudulently concealed their ownership of a number of different securities, including Environmental Packaging Technology Inc. ("EPTI") and Cure Pharmaceuticals ("CURR"), in order to evade federal securities regulations as part of pump-and-dump and other market manipulation schemes.[2] CW-1 indicated that he used different brokerages, including Silverton,

---

[2] CW-1 is expected to plead guilty to federal securities fraud charges, and is cooperating with the government in the hope of obtaining leniency when he is sentenced. Information

to sell these securities to unsuspecting investors as part of those schemes.

11.     A second cooperating witness ("CW-2") is a lawyer for a Swiss law firm who helped

CW-1 set up nominee entities to hold EPTI, CURR and other microcap securities on CW-1's

behalf.[3]  CW-2 advised the FBI that he worked with KNOX and others to transfer those

securities from the nominee entities to Silverton, charging CW-1 approximately 4.5 percent of

the trading proceeds for this service.  CW-2 has told investigators that KNOX sold the shares at

the direction of CW-1 and CW-2, knowing that they were owned by a single investor or control

group of investors, as opposed to the multiple nominee entities in whose name they were held.

12.     A third cooperating witness ("CW-3") is an attorney and law partner of CW-2.[4]  CW-3

has also advised the FBI that KNOX was a knowing participant in the securities fraud scheme

described above.

---

provided by CW-1 has been corroborated by, among other things, documents, emails, consensual recordings, and trading records, as well as interviews with CW-2 and CW-3.

[3] CW-2 is expected to plead guilty to federal securities fraud charges, and is cooperating with the government in the hope of obtaining leniency when he is sentenced.  Information provided by CW-2 has been corroborated by, among other things, documents, emails, trading records, and consensual recordings, including calls to KNOX through the encrypted application "Signal", as well as interviews with CW-1 and CW-3.

[4] CW-3 is expected to plead guilty to federal securities fraud charges, and is cooperating with the government in the hope of obtaining leniency when he is sentenced.  Information provided by CW-3 has been corroborated by, among other things, documents, emails, trading records, and interviews with CW-1 and CW-2.

### THE PUMP-AND-DUMP OF EPTI

13.     Set forth below is a brief overview of the pump-and-dump of EPTI, which I detail here as an example of the fraudulent manipulation in which KNOX is engaged.  This overview is derived from my review of trading records, e-mails, bank records, recorded conversations between CW-1 and CW-2 made before CW-2 began cooperating, interviews with CW-1, CW-2 and CW-3, and consensually recorded calls with KNOX and others.

*A.  Transfer of EPTI shares into Silverton.*

14.     In or about August, 2013, CW-1 took control of a publicly traded company with minimal assets and operations (the "EPTI Public Shell") by acquiring the vast majority of the company's available shares.  CW-1 disguised his ownership by distributing the shares among a number of nominee entities that were created for him by CW-2, CW-3, and others.  These entities— Mithical Holdings, Widder Investments, Sayson Capital, and Woolf Ventures—ultimately each held, at the time of the reverse merger described below, approximately 2.6 million shares each, which was just under the 5 percent threshold that would trigger heightened disclosure requirements and selling restrictions.  Each entity had a different purported beneficial owner. CW-3, for example, was the purported beneficial owner of the shares held by Widder Investments.  In reality, however, CW-1 controlled all of the shares held by the nominees and, by late 2015, virtually all of the free-trading shares of the EPTI Public Shell.

15.     In 2016, CW-1, working with CW-2 and CW-3, began merging the operations of a private company, Environmental Packaging Technology, into the EPTI Public Shell in order to create the publicly traded company now known as EPTI.  This process is known as a "reverse

merger."[5]

16.     The reverse merger of EPTI and the EPTI Public Shell was scheduled to close in early

June 2017.  At that time, CW-1, CW-2, CW-3 and others planned to execute a promotional

campaign to boost the price and trading volume of EPTI stock, which was very thinly traded, so

that they could sell their shares to unsuspecting investors.  In or about and between April 2017 to

May 2017, in preparation for that pump-and-dump, the conspirators directed the transfer of

shares held by the four nominee entities—Mithical, Widder, Sayson and Woolf—to Silverton

and, to a lesser extent, to another asset manager based in Belize (the "Belize Broker").

17.     For example, on or about April 3, 2017, CW-2 signed a transfer instruction form on

behalf of Sayson Capital authorizing the transfer of 2,672,169 shares of the EPTI Public Shell

into Silverton's omnibus trading account at Tendall Capital, a brokerage firm in Malta.  On or

about April 24, 2017, KNOX signed an equity authentication form to deposit the Sayson shares

into Silverton's omnibus account.

---

[5] The process was succinctly summarized in the Ninth Circuit's decision in SEC v. M & A W.
Inc.:

> A reverse merger is a transaction in which a privately held
> corporation acquires a publicly-traded corporation, thereby
> allowing the private corporation to transform into a publicly traded
> corporation without the necessity of making an initial stock
> offering. Often, . . . the public corporation is a shell company with
> minimal assets and liabilities and no actual operations. To
> effect the reverse merger, the shell public corporation will
> exchange its treasury stock for all outstanding shares of the
> privately-held corporation. In consideration, the controlling
> shareholders of the shell public corporation transfer a majority of
> their shares to the owners of the private corporation. After the
> . transaction, the newly merged public corporation will assume
> the identity and name of the former private company. Thus, the
> private corporation is transformed into a publicly traded company,
> without going through the complicated process of an initial stock
> offering.

538 F.3d 1043, 1046-47 (9th Cir. 2008).

18.     Likewise, on or about April 17, 2017, CW-2 signed a transfer instruction form on behalf

of Widder Investments to transfer 2,538,501 shares of the EPTI Public Shell to Silverton's

account at Interactive Brokers in the United Kingdom.  A stock transfer form dated April 26,

2017, signed by KNOX, authorized the transfer of these shares to Silverton's omnibus account.

19.     Similarly, on or about April 24, 2017, CW-2 signed a transfer authorization form

authorizing the transfer of Mithical's 2,622,674 shares into Silverton's account at Wedbush, a

brokerage firm in the United States.  On or about May 2, 2017, KNOX signed a Deposit

Securities Request form authorizing the transfer of Mithical's shares into Silverton's omnibus

account at Wedbush.  On the form, KNOX falsely represented that 2,622,675 shares had been

purchased by, issued to, or transferred to Silverton within the prior year—even though KNOX

had, by that time, already transferred approximately five million additional EPTI shares into

Silverton accounts at Tendall Capital and Interactive Brokers, as noted above.

20.     On or about May 3, 2017, Woolf Ventures transferred its 2,640,947 shares of the EPTI

Public Shell to the Belize broker's account at Beaufort Securities in the United Kingdom.  CW-2

signed the transfer form on behalf of Woolf Ventures.

21.     CW-1, CW-2 and CW-3 have advised the FBI that the transfer of the EPTI shares from

the nominee owners to the Silverton omnibus account was intended to help obscure the true

ownership of those shares.  Moreover, I have reviewed records of an online chat between KNOX

and a broker at Tendall Capital in October 2016 in which KNOX effectively acknowledged that

if he could not deposit the shares into the Silverton omnibus accounts, his clients would need to

disclose the true beneficial owners of the shares and would have no reason to use his services.

KNOX asked: "m[u]st each and every BO [beneficial owner] be identified? Or if position

renamed into Silverton, will then accept us?" The Tendall representative replied: "Hi Roger

[KNOX], let me give them a quick call to clarify as your situation is unique in a sense that you have clients put position in your name first." KNOX responded, "ok, thx, appreciated, **my client may as well as go direct [to the brokerage], as I would be unable to add value.**"

### B. The Pump and Dump of EPTI

22.     In or about May 2017, as part of the reverse merger of the private company Environmental Packaging Technology into the EPTI Public Shell, the Public Shell issued 40,000,000 *restricted* shares to the private company's shareholders. As a result, while the total number of outstanding shares increased, and CW-1's ownership stake declined in percentage terms, CW-1 through his nominee entities continued to control almost all of the company's *free-trading* shares.

23.     In anticipation of closing the reverse merger, on June 9, 2017, CW-1, assisted by CW-2 and others, engaged in a private placement of EPTI shares, which raised approximately $5 million. CW-1, assisted by CW-2 and others, then used approximately $1 million of this money to fund a paid campaign to promote EPTI shares through false and misleading e-mail "blasts" and a direct mail campaign. In order to obscure the fact that the campaign was being paid for by EPTI and its controlling shareholders, CW-1 and CW-2 created a new entity, Svarna, through which they funneled the funds to pay for the campaign. CW-2 engaged KNOX to create Svarna, as detailed below.

24.     On or about May 19, 2017, CW-2 emailed KNOX, saying: "We need to form an entity with the name Svarna LLC, if available. If not available, please use any name available to avoid delay and we will change the invoice and marketing contract accordingly. We will provide the KYC [know-your-customer] for BO [beneficial owner] by Monday to include passport, utility bill and background."

25.     KNOX replied on May 22, 2017, telling CW-2 that the "amended Marshall Island company name Svarna Ltd. is available and incorporation has been requested today." That same day, CW-2 sent an e-mail to the e-mail address operations@silverton.ch, "documentation regarding the KYC [know-your-customer] for a new entity – Svarna Ltd. – that I understand you are forming on behalf of the BO."[6] Attached to the e-mail was a utility bill and passport for the girlfriend of another co-conspirator ("CC-1"). Silverton Operations then sent back to CW-2 a draft of a document known as a "Form A," listing Svarna's beneficial owner as CC-1's girlfriend.

26.     After Svarna was incorporated, CW-1 and CW-2, with the assistance of others, wired approximately $1 million in proceeds from the EPTI private placement to Svarna's account at Silverton. CW-2 then, purportedly on behalf of Svarna, directed Silverton to wire this same money to a media company hired to promote EPTI (the "Promoter").

27.     The Promoter, in turn, hired a second company (the "Direct Mail Company") to coordinate a direct mail campaign to promote EPTI. On or about and between June 2 and June 5, 2017, the Promoter made two payments, totaling $724,000, to the Direct Mail Company.

28.     The ensuing direct mail campaign was directed to investors in all 50 states, including the District of Massachusetts. As part of the campaign, the Promoter and the Direct Mail Company produced a 16-page direct mail piece entitled the "Trump Effect," which stated that the election of President Trump could be a boon for EPTI, and if investors "act[ed] now … [they] could grab quadruple-digit gains!" On or about June 1, 2017, the Direct Mail Company e-mailed the Promoter stating that the mailing would be would be split into two "drops" of approximately

---

[6] From my review of e-mails, I know that typically, KNOX or his business partner used the e-mail address operations@silverton.ch

500,000 pieces of mail each and mailed to 1,026,540.

29.     On or about June 2, 2017, the Direct Mail Company sent an e-mail to the Promoter
attaching sample mailings for the two "drops" (Panel A and Panel B). The Direct Mail Company
asked for approval for these mailings. That same day, the Promoter wrote back stating that his
"client" had approved the two samples. Both samples were addressed to recipients in
Springfield, Massachusetts, and the outside cover of the mailings asked, "Are you ready for the
new American Manufacturing Boom? It could mean 1,118% profits for those who act RIGHT
now!"[7]

30.     In the wake of the promotional campaign, the price and average trading volume of EPTI
increased dramatically. Prior to the campaign, between February 2017 and June 8, 2017, EPTI's
share price ranged from a low of $0.75 to a high of $1.05, on average daily trading volume of
approximately 2,360 shares. Between June 9, 2017 and June 13, 2017, however, with the
campaign underway, EPTI traded between $1.13 and $1.27 per share, on average daily volume
of approximately 493,275 shares. By June 27, 2017, the stock's price had increased to $2.18 per
share. During this period, individuals in the District of Massachusetts purchased EPTI shares.

31.     As EPTI's share price and trading volume increased, KNOX directed the sale of CW-1's
shares through the various Silverton brokerage accounts. For example, on or about May 22,
2017, KNOX wrote to Tendall Capital: "Please sell 25,000 shs EPTI each level at 1.06, 1.07,
1.08, 1.09 and 1.10," adding: "show only 1,000 shs at time." Based on my training and
experience, I believe that KNOX was attempting to gradually build up the price and volume of

---

[7] Throughout the direct mail campaign, the Direct Mail Company e-mailed progress reports on
the campaign to the Promoter. As an example, on or about June 13, 2017, the progress report
noted that 18,837 direct mail pieces had been delivered by truck to a central post office in
Springfield, Massachusetts. As another example, or or about June 19, 2017 the progress report
noted that 22,692 pieces of mail had been delivered to the Springfield, Massachusetts post office.

EPTI in advance of the pump-and-dump. By limiting the trades to 1,000 shares at a time, I believe KNOX was attempting to avoid flooding the market with shares and thereby scaring off potential investors.

32.     Likewise, on or about June 6, 2017, KNOX instructed Tendall Capital to sell "5k @ 1.06," referring to 5,000 shares of EPTI at $1.06/share. That same day, KNOX placed orders to sell 5,000 additional shares of EPTI at $1.07 and another 5,000 shares at $1.08. On or about June 12, 2017, KNOX sent an order to Tendall, "EPTI sell 50k @ 1.00 limit." Tendall reported back later in the day, "sold 25k EPTI at 1.27 working another 25k." These sale orders continued throughout the pump-and-dump.

33.     On or about and between June 9, 2017 and June 27, 2017, the Silverton Wedbush account sold approximately 455,000 EPTI shares at KNOX's direction, reaping trading profits of nearly $700,000. During that same time period, the Silverton account at Tendall Capital sold more than 440,000 shares, netting proceeds of more than $600,000. All together, KNOX's sale of CW-1's EPTI stock through Silverton in June 2017 generated proceeds of approximately $1.3 million. In addition, the Belize Broker's account at Beaufort sold approximately 178,000 of CW-1's shares held in the name of Woolf Ventures, generating proceeds of approximately $236,000.

        C. *SEC Investigation into EPTI*

34.     On or about June 27, 2017, the SEC suspended trading in EPTI and initiated an investigation into the manipulation of EPTI's shares. As part of the investigation, the SEC issued subpoenas to EPTI and others.

35.     CW-1, CW-2 and CW-3 have independently advised the FBI that, as a result of the SEC's investigation, and in order to avoid regulatory scrutiny, they decided to keep the proceeds from the EPTI pump-and-dump at Silverton and the Belize Broker instead of transferring the

money to their own accounts. Further, CW-2 and CW-3 have told investigators that in September 2017, as the SEC continued its investigation, they met with KNOX and his business partner ("CC-2") in Montreux, Switzerland (the "Montreux Meeting") to determine how to "clean up" the beneficial ownership structure of EPTI and other microcap stocks.

36.     I believe, based on my discussions with CW-2 and CW-3, as well as my review of text messages and e-mails, that the term "clean up" meant that KNOX would change the beneficial ownership of EPTI's nominee shareholders so that CW-3 and others would no longer be linked to the nominee shareholders in the event that the SEC obtained documents evincing this beneficial ownership. Indeed, at the Montreux Meeting, KNOX, CW-2, CW-3 and CC-2 decided to remove CW-3 as the beneficial owner of Widder and certain other nominee entities. They also decided to remove CC-1's father as the beneficial owner of Mithical Holdings. In addition, they decided to backdate the relevant forms to falsely indicate that those replacement beneficial owners had been in place at the time the nominee entities acquired EPTI shares prior to the reverse merger of the EPTI Public Shell into EPTI. I have reviewed documents seized from CW-2 during the execution of a search warrant in May 2018—prior to the time he began cooperating with the government—that corroborate these changes, as well as computer metadata that indicates that the documents were, in fact, backdated.

37.     Likewise, when CW-3 was initially interviewed by FBI agents in June 2018, he showed them a series of text messages among KNOX, CW-2, CW-3 and CC-2 over an encrypted application called Threema. These text messages were part of a group text message exchange called the "Montreux Grp" that included messages from CW-2 and CW-3, as well as users identified as "Silver Arrow" and "Silver Eagle." CW-3 told investigators that "Silver Arrow" is

KNOX and Silver Eagle is CC-2.[8]   In these text messages, KNOX, CW-2, CW-3 and CC-2 discussed replacing the beneficial owners of several of the nominee entities referenced above that were holding shares on behalf of CW-1.

### THE SALE OF CURE PHARMACEUTICALS STOCK

38.     As yet another example of the securities manipulation in which KNOX has been involved, CW-1, CW-2 and others orchestrated the reverse merger of a private company, "Cure Pharmaceuticals," into a publicly traded shell company (the "Cure Public Shell") to form a public company that traded under the ticker symbol "CURR".  As with EPTI, CW-1 and his associates controlled virtually all of the free-trading shares of the public company, but distributed those shares into purportedly independent nominee entities created by CW-2 and CW-3.  KNOX and the Belize Broker then sold those shares as part of a pump-and-dump, generating fraudulent proceeds of more than $2 million.

*A.   The Pump-and-Dump Cure Pharmaceuticals*

39.     Beginning in or about June 2016, CW-1, together with others, purchased the Cure Public Shell.  By September 2016, CW-1 controlled approximately 95 percent of the total outstanding shares of the Cure Public Shell through a number of nominee entities created by CW-2 and CW-3— Ballis Holdings, Burge Capital, Deus Ventures, Thoas Group, and Ophir Investments—each of which held under 5 percent of the company's total outstanding shares..

40.     On or about November 7, 2016, the reverse merger of Cure Pharmaceuticals, a privately held company, into the Cure Public Shell closed, and because additional restricted stock had

---

[8] Statements in the text message exchange appear to confirm that KNOX is Silver Arrow.  As an example, in one text message on or about November 20, 2017, "Silver Arrow" references a recent visit to the United States, noting that he "wiped" his phone prior to travel.  I have reviewed travel records indicating that KNOX traveled to the United States on or about November 2, 2017, shortly before that message was sent.

been issued as part of the merger, CW-1 was now in control of 29 percent of the company's outstanding shares, and approximately 80 percent of its free-trading shares.

41.     CW-1, CW-2 and CW-3 thereafter began secretly working with KNOX and CC-2 to transfer CURR shares to Silverton for sale on the public markets.  On or about February 7, 2017, CW-2 emailed KNOX, saying: "Lately I've been using Signal to keep the conversations on my iPhone private.  I'd like you to install it to [sic], so we can be confident that only you and I read our messages or hear our calls."  KNOX and CW-2 began communicating through Signal, which is an encrypted application for mobile phones.

42.     On or about February 13, 2017, CW-3 sent an e-mail to CC-2 at Silverton Operations, copying CW-2.  CW-2 wrote, "Hello [CC-2], See attached."  Attached to the e-mail was a form identifying Deus Ventures as the beneficial owner of approximately one million CURR shares. CW-3 signed the form as the purported beneficial owner of Deus Ventures.

43.     The next day, CC-1 sent an e-mail to CC-2 at Silverton Operations, copying CW-2, attaching two forms identifying CC-1 as the beneficial owner of approximately one million CURR shares held by nominee Ballis Holdings, and CC-1's father as the beneficial owner of approximately one million CURR shares held by nominee Ophir Investments.

44.     On or about March 3, 2017, Deus Ventures deposited its CURR shares into the Silverton's account at Tendall Capital.  That same day, Ophir Investments deposited its CURR shares into Silverton's account at Wedbush Securities.  On or about March 16, 2017, Ballis Holdings deposited its CURR shares into Silverton's account at Tendall Capital.

45.     Prior to this time, there had been very little trading activity in CURR.  Beginning in or about late February 2017, however, CW-1 arranged manipulative match-trading of CURR shares, and CURR itself also released eight successive press releases.  As a result, CURR's

trading volume increased from approximately 6,000 shares per day to nearly 35,000 shares per day, allowing Silverton to sell nearly 150,000 shares, thereby generating proceeds of more than $1 million. Chat conversations obtained from various brokerages, including Tendall, indicate that KNOX directed this trading.

46.     In or about late March 2017, CURR trading proceeds of nearly $1 million were transferred from Silverton SA to a bank account in Canada controlled by CW-2 and CW-3, and later wired to an account in Switzerland controlled by CW-3. CW-1, CW-2 and CW-3 had similarly transferred CURR shares to the Belize Broker, which also dumped more than $1 million worth of CURR shares on the public market in or about March 2017.

*B. Changing the beneficial ownership of the Cure nominee entities*

47.     As with EPTI, CW-2, CW-3, KNOX and CC-2 became concerned that the SEC or other law enforcement agencies would link trading in CURR to trading in EPTI because the beneficial owners of the CURR stock also owned EPTI. CW-2 and CW-3 have advised the FBI that, in light of this concern, they worked with KNOX and CC-2 to falsify documents to reflect different beneficial owners for shares held by the nominee entities Ballis, Deus and Ophir. I have also reviewed documents recovered from CW-2's computer incident to the search referenced above that corroborate these changes, as well as metadata indicating that the CURR documents, like the EPTI documents, were backdated.

48.     Text messages obtained from CW-3 further confirm that KNOX was aware of the changes to the beneficial ownership of the CURR shares. As one example, on or about December 4, 2017, KNOX, using the pseudonym Silver Eagle, wrote to the Montreux Group, stating, "I have your letters" for "Deus, Ballis, Ophir," and the "ones I mentioned above were under the old UBOs originally. I have removed those names and have the current form A's so

that's ok. Just need the [law firm] letter to complete the loop." In a later exchange, CW-2 wrote:

"Will need to send new BO [beneficial owner] letter for Deus/BAR and Ophir/ELF, as dated 15

February 2017. Our BO letter was dated 8 February 2017, which should be dated on or after 15

February 2017." KNOX replied, "Ok. Will replace with all new paperwork and destroy old

ones."

## RECORDED CALLS WITH KNOX

49.    At the direction of the FBI, CW-2 has spoken with KNOX several times over the

encrypted application "Signal." One such conversation, which was consensually recorded, took

place on or about June 21, 2018. As set forth below, I believe the conversation confirms that

KNOX: (i) purposefully evades securities laws disclosure requirements, (ii) intentionally uses

different brokerages to deceive regulators, and (iii) is actively concerned about his activities

being uncovered by law enforcement.

50.    First, the recorded conversation demonstrates that KNOX is aware of the five percent

disclosure rule, and that his clients set up nominee entities to evade that rule. For example, CW-

2 asked KNOX how he structures deals through Silverton, asking, "So on any transaction you're

willing to carry up to 20% with four [beneficial owners]?" KNOX replied, "Correct." CW-2

asked KNOX to clarify, saying: "Four holders ... each one can have a 5% position?" KNOX

corrected CW-2, stating: "4.99, or whatever." I believe this call demonstrates that KNOX limits

the percent of stock each nominee client holds to less than five percent in order to avoid

disclosure requirements and broker scrutiny.

51.    Likewise, KNOX described how the conspirators can use four "clients" to unload a

company's stock during a fraudulent scheme. KNOX explained: "You've got four clients, A, B,

C, D. A sells first, A sells all of his or her position." He continued: "So, I'm very happy for A to

go back to the company and say ... 'Can I buy another 5%?' ... And [the company] says 'certainly' ... client A reloads another 5% and off he or she goes again." KNOX concluded: "So ... when [A] sell[s], I would have sold 25%, when B flattens and reloads I would have sold 30%, client C flattens ... 35%. So ... there's that opportunity as well. But again, at any one point in time, a snapshot in time, we're not sitting with—, " at which point CW-2 interrupted to finish KNOX's sentence: "—more than 20%," to which KNOX responded "Yeah, yeah." I believe that this conversation further illustrates how KNOX strategically avoids disclosure requirements by having "clients" "reload" their shares so at any one point in time, they are not holding more than 5 percent and Silverton is not holding "more than 20%."

52.    Second, the recorded conversation indicates that KNOX believes the 20 percent overall cap helps evade law enforcement scrutiny. Thus, CW-2 asked KNOX: "Is there any specific reason you won't go over 20[%]? Or is that just your policy?" KNOX replied: "No, no ... It's pretty random. But ... I like the 80-20 rule, where ... 80% of your wealth comes from 20% of your clients." KNOX continued: "Well to put it on an extreme side, if we had ... 16 clients of a deal, 16 clients with 5% ... 80% of the deal. If someone knocked on our door and said 'Wintercap [Silverton], you have got 16 clients ... each with 5% of this deal ... Roger, you have got knowledge of a lot of the clients, how can this be a free market?' You know what? I'd have to shrug my shoulders and go, 'fair one, fair one.'" He continued on, stating: "If I have 20% of the deal ... I can argue that [it is a free market]." KNOX thus made clear that by limiting his clients' combined holdings to 20 percent at any one time, he hopes to avoid law enforcement scrutiny.

53.    Third, KNOX explained to CW-2 why he uses multiple brokerages to sell the shares held by his nominee clients. CW-2 asked: "[Y]ou're trading under Wintercap, so A, B, C, D are all

being traded under Wintercap's name?" KNOX replied: "Yes." CW-2 continued: "But using

various brokerages, so that way ... we're not going to be stuck ... if something happens to one of

the brokerage houses." KNOX replied: "Correct ... our main effort is to have that stock at four

different brokerages ... one client at one brokerage ... Clients A, B, C, and D, are with

brokerages A, B, C, and D ... We aim to spread it out, four different clients, four different

brokerages with extremely good execution." KNOX then explained: "So if there is a bad egg ...

that's totally segregated." KNOX thus made clear that, if one of the brokerages were the subject

of an enforcement action, KNOX and his clients would still have access to the money held at the

other brokerages.

54.     Fourth, KNOX explained that, although he did not like to travel to the United States,

"[t]he benefit of going there is ... I [can] go to New York, walk down the street, shake hands

with the broker and ... just like sitting with you around a table at Montreux, they get the feel for

me." KNOX then made clear that his reluctance to visit the United States is related to potential

law enforcement scrutiny. KNOX asked CW-2: "[I]f I go in, even if I don't have a laptop, don't

have a cell phone ... or have a ... frickin, brand new one with a new SIM Card with two

numbers in it ... what's the worst they could do me for?" I believe that KNOX's question

demonstrates his knowledge that his activities are illegal.

**CONCLUSION**

55.     Based on my knowledge, training and experience and the facts set forth in this affidavit, I

have probable cause to believe and I do believe that KNOX, together with others known and

unknown, committed conspiracy to commit securities fraud, in violation of Title 18, United

States Code, Section 371, and securities fraud, in violation of Title 15, United States Code,

Sections 78j(b) and 78ff.

Respectfully submitted,

Keith Brown
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
on September 17th, 2018

M. Page Kelley
United States Magistrate Judge
District of Massachusetts